UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ANTHONY FOSTER,

        Plaintiff,

   v.

LT. DONAHUE, C.O. J. MURRAY, C.O. E.
THATCHER, C.O. G. CLEVELAND, and D.
VENETOZZI,

        Defendants.

**DECISION AND ORDER**

13-CV-1177S

## I. INTRODUCTION

In this action, Plaintiff Anthony Foster alleges that various defendants, all of whom are employees of the New York Department of Corrections and Community Supervision ("DOCCS"), violated his constitutional rights by using excessive force against him, failing to protect him again the use of excessive force, denying him his right to due process at a disciplinary hearing, and affirming the decision that resulted from that hearing. Before this Court is Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which Foster opposes. (Docket Nos. 36, 42-48). For the following reasons, Defendants' motion for summary judgment is granted.

## II. BACKGROUND

Unless otherwise noted, the following facts are not disputed for purposes of the motion for summary judgment. This Court takes the facts in the light most favorable to Foster, the non-moving party.  See Mitchell v. City of New York, 841 F.3d 72, 75 (2d Cir. 2016) (at summary judgment, a court "views the evidentiary record in the light most favorable to ... the non-moving party").

At all relevant times, Plaintiff Anthony Foster was an inmate at Southport Correctional facility, under the care and custody of DOCCS. (Defendants' Statement of Undisputed Facts, Docket No. 36-2, ¶ 15; Plaintiff's Statement of Undisputed Facts, Docket No. 41, ¶ 15.) Defendant Donald Venetozzi was the Acting Director of the Special Housing/Inmate Disciplinary Program for DOCCS. (Venetozzi Declaration, Docket No. 36-10, ¶¶ 1-2.) The other defendants were corrections officers employed by DOCCS and assigned to Southport. Defendant Richard Donahue was a lieutenant.

## A.    The Use-of-Force Incident

On December 30, 2010, Foster was participating in Southport's shower program on C block, where he was housed. (Docket No. 36-2, ¶¶17-19; Docket No. 41, ¶¶17-19.) It was standard for inmates to be handcuffed before and after showering. (Docket No. 43, ¶ 4.) According to Foster, all the groups before his received 10-minute showers. (Docket No. 43, ¶ 12.) Before entering the shower, Foster asked that his group receive the 10-minute shower they were entitled to. (Id., ¶ 11.) Foster asserts that his group received only a 6-minute shower. (Id., ¶ 12.)

During Foster's shower, defendant Murray was either escorting inmates to and from the showers, or exchanging the buckets in the shower area. (Docket No. 36-8, ¶ 5; Docket No. 20-1 at p. 100.) Defendants Thatcher and Cleveland were transporting inmates from their cells to the showers, guarding them while they showered, and escorting inmates back to their cells. (Docket No. 36-9, ¶ 5.)

At approximately 10:50 a.m., when his shower ended, Foster was handcuffed and ordered to exit shower 1 walking backwards. (Docket No. 36-2, ¶ 19; Docket No. 41, ¶ 18.) What happened next is in dispute. According to Defendants, Foster then turned "in

2

an aggressive manner" toward Murray and "attempted to strike him with his head and right shoulder." (Docket No. 36-2, ¶ 19.) Murray "pushed [Foster] against shower number 2," but Foster "continued to struggle violently." (Id., 20.) Murray then placed Foster in a bear hug and forced him to the floor. (Id.) Thatcher helped control Foster's legs until Cleveland could apply mechanical restraints to his legs. (Id., ¶ 21.)

According to Foster, as he exited the shower, "Defendant Murray ran behind [him] and punch[ed] [him] in the back of his head." (Docket No. 41, ¶ 19.) Foster agrees that Murray then pushed him against shower number 2 and placed him in a bear hug, but claims that Murray then "slam[med] [him] to the ground." (Id., ¶ 20.) Foster states that, once he was on the ground, Thatcher joined Murray in "punching, kneeing and kicking [him] while he was handcuff[ed] from behind on the ground," after which Thatcher and Cleveland placed mechanical restraints on his legs. (Id., ¶ 21.)

Foster was escorted from the showers to the C-block dayroom, where nurse Kathleen Walsh examined him. (Docket No. 36-2, ¶¶ 25-26; Docket No. 41, ¶¶ 25-26.) Nurse Walsh recorded that Foster complained of tenderness on the back of his head, but she noted "no swelling or injury" there; he also complained of back pain, but Walsh noted "no deformity or swelling." (Docket No. 42-1 at p. 142.) Walsh noted a 3 mm area of minor abrasion on his left clavicle. (Id.) Foster contends that Walsh's report did not document the full extent of his injuries. (Docket No. 43, ¶ 27.) Nonparty corrections officer Wheaton took photographs of Foster documenting the use of force. (Docket No. 30-8 at p. 5.) A video was made of Foster's escort from the shower, medical examination, and use-of-force photograph procedures. (Docket No. 37.)

At 4:00 p.m. on the same day, Nurse William West observed Foster in his cell.

(Docket No. 42-1 at p. 143.) He noted that Foster's wrists appeared "slightly swollen," and that Foster had a "slightly raised area approximately one fourth inch high and approx. the size of a half dollar coin on the left back area" of his head. (Id.) At 7:30 PM, Nurse Aln[1] noted a "small raised area on back of head" but "no open wounds." (Id.)

## B.    Initial Orders

Immediately following the December 30, 2010, incident, Foster was issued deprivation and restraint orders, which deprived him of showers, haircuts, cell cleanup, and recreation, and caused him to be fully restrained outside his cell. (Docket No. 36-2, ¶ 60; see Docket No. 42-1 at pp. 145-148.) These orders were in effect at least until January 21, 2011; Foster alleges they lasted "almost two months." (Docket No. 42 at p. 17.) After these orders were lifted, Defendants assert that Foster "faced no more than ordinary SHU conditions." (Docket No. 36-2, 60).  Foster had served as an inmate porter at Southport before the December 30 incident, but after it, he was unable to regain this position. (Docket No. 41, ¶¶ 57, 60.)

## C.    The Tier III Hearing

On January 1, 2011, Foster was served with a misbehavior report based on the December 30 incident. (Docket No. 36-2, ¶ 39). Lieutenant Donahue held a Tier III hearing on the misbehavior report beginning on January 11, 2011. (Docket No. 36-2, ¶ 40; hearing transcript at Docket No. 20-1, pp. 80-104.)  Foster called six witnesses: three officers who were present (Defendants Cleveland, Thatcher and Murray) and three inmates who observed the incident.[2]  (Docket No. 36-2, ¶ 44.) The officers all testified that Foster

---

[1] The spelling of this nurse's name is difficult to discern from the treatment note.

[2] Defendants assert that Donahue called seven witnesses in addition to Foster (Docket No. 36-2, ¶ 43), but

4

attacked Murray; the inmates all testified that Murray attacked Foster. (See Docket No. 20-1, pp. 91-92, 96, 100, 85, 87, 88.)

Foster attempted to call three additional witnesses: Nurse West, an unnamed "nurse administrator," and corrections officer Sandroni, who was operating the gate between the cells and the showers at the time of the incident. (Docket No. 20-1 at pp. 84, 89-90, 94.)

Defendant Donahue denied these three witnesses "as not having direct, material testimony to [the] incident of misbehavior." (Docket No. 36-2, ¶ 45.) Donahue denied West because he was not present at the use of force, and did not examine Foster directly after the use of force. (Id., ¶ 46.) Donahue denied the nurse administrator for the same reasons. (Id., ¶ 47.) Donahue denied Sandroni because she was "not present there on the gallery at the time of the incident." (Docket No. 20-1 at p. 94.) During his hearing, Foster stated that Sandroni could "clearly look down the company," and "had a clear view." (Docket No. 20-1 at p. 96.) Foster continues to maintain that Sandroni was 10-12 feet away from the showers at the time of the incident, and had a "plain view of the whole incident." (Docket No. 41, ¶ 45; Docket No. 43, ¶ 35.)

At the close of the Tier III hearing, Donahue found Foster guilty of misbehavior on December 30, and sentenced him to a term of nine months in the Special Housing Unit ("SHU"), with three months suspended. (Docket No. 36-2, ¶ 50.) "Mental health staff" at Southport further cut Foster's SHU penalty. (Id., ¶ 58.) Foster began serving his SHU sentence on October 16, 2011. (Id., ¶ 61.) At his deposition, Foster recalled that he served for approximately 100 days in SHU. (Id., ¶ 59.) DOCCS records reflect that Foster served

---

the record shows that Donahue only called six besides Foster.

96 days in SHU as result of discipline from the December 30, 2010 use of force. (Docket No. 36-2, ¶ 63.) As a result of the use of force, Foster asserts that he has suffered from nightmares and trauma, as well as migraines, backaches, and neckaches. (Amended Complaint, Docket No. 5, ¶¶ 47-48.)

**D.    Foster's Appeals**

Foster appealed his Tier III hearing on January 24, 2011. (Docket No. 36-2, ¶ 52; Docket No. 20 at pp. 63-77). On March 24, 2011, Defendant Venetozzi affirmed the results of the hearing in a one-sentence decision. (Id., ¶ 53; see also Docket No. 20-1 at p. 78.) Foster then filed an Article 78 proceeding in New York Supreme Court, seeking to overturn his disciplinary penalty. (Docket No. 36-2, ¶ 55). On April 5, 2012, New York Supreme Court Justice James Hayden found that Foster was denied a full and fair hearing, in part because his witness requests were denied. (Docket No. 36-5 at p. 2-3.) Justice Hayden reversed the disposition of Foster's Tier III hearing, remanded for a new hearing, and expunged Foster's record regarding the hearing (Id.) On July 30, 2013, Foster's hearing was administratively expunged, and DOCCS determined that a rehearing was not warranted. (Docket No. 36-2, ¶ 56; Docket No. 20-1 at p. 105.)

Foster filed a grievance against Murray and Thatcher on January 10, 2011 for their use of force against him, but stated that Cleveland did not take part in the use of force. (Docket No. 20-1 at pp. 114, 116, 121.)

## III.  DISCUSSION

Cognizant of the distinct disadvantage that *pro se* litigants face, federal courts routinely read their submissions liberally, and interpret them to raise the strongest

arguments that they suggest.  See Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 596, 30 L. Ed. 2d 652 (1972); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).  This is especially important when reviewing *pro se* complaints alleging civil rights violations. See Weinstein v. Albright, 261 F.3d 127, 132 (2d Cir. 2001).  Since Foster is proceeding *pro se*, this Court has considered his submissions and arguments accordingly.

Foster raises three claims in his complaint.  First, he claims that Murray and Thatcher violated his Eighth Amendment rights by using excessive force against him on December 30, 2010. Second, he claims that Cleveland violated his Eighth Amendment rights by failing to protect him from Murray's and Thatcher's use of excessive force. Third, he claims that Donahue and Venetozzi violated his Fourteenth Amendment rights: Donahue by depriving him of a fair and impartial hearing by failing to call three witnesses he requested; and Venetozzi by affirming Donahue's decision.

Defendants move for summary judgment on the basis that Foster cannot establish his excessive force claim against Murray and Thatcher, or his procedural due process claims against Donahue and Venetozzi, and has failed to exhaust his failure-to-protect claim against Cleveland.

## A.    Summary Judgment

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment. Anderson, 477 U.S. at 252. A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence showing that its version of the events is not wholly fanciful." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998). That is, there must be evidence from which the jury could reasonably find for the non-moving party. See Anderson, 477 U.S. at 252.

As noted, "[i]t is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they suggest.'" Triestman v. Fed. Bur. of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (quoting Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006)). "A *pro se* plaintiff, however, cannot defeat a motion for summary judgment by simply relying on the allegations of his complaint; he must present admissible evidence from which a reasonable jury could find in his favor."

Belpasso v. Port Auth. of NY & NJ, 400 Fed. Appx. 600, 601 (2d Cir. 2010); see Champion v. Artuz, 76 F.3d 483, 485 (2d Cir. 1996) (summary judgment properly entered against *pro se* plaintiff who failed to oppose motion with admissible evidence after receiving plainly worded warning of the consequences of such failure).

In the end, the function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

**B.    42 U.S.C. § 1983**

Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. See 42 U.S.C. § 1983. On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution. See Graham v. Connor, 490 U.S. 386, 393-94,109 S. Ct. 1865, 1870, 104 L. Ed. 2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n.3, 99 S. Ct. 2689, 2695, 61 L. Ed. 2d 433 (1979)). Accordingly, as a threshold matter in reviewing claims brought pursuant to § 1983, it is necessary to precisely identify the constitutional violations alleged. See Baker, 443 U.S. at 140. Here, Foster's claims are grounded in the Eighth and Fourteenth Amendments.

Personal involvement in the deprivation of a federal constitutional right is the *sine qua non* of liability under § 1983. See Haygood v. City of New York, 64 F. Supp. 2d 275, 280 (S.D.N.Y. 1999). It is well settled in this circuit that personal involvement by

defendants in cases alleging constitutional deprivations is a prerequisite to an award of damages under § 1983.  See McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977); Richardson v. Coughlin, 101 F. Supp. 2d 127, 129 (W.D.N.Y. 2000); Pritchett v. Artuz, No. 99 Civ. 3957 (SAS), 2000 WL 4157, at *5 (S.D.N.Y. Jan. 3, 2000).

The Second Circuit construes personal involvement in this context to mean "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates."  Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996); see also Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).  Personal involvement need not be active participation.  It can be found "when an official has actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act."  See Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989).  Thus, personal involvement can be established by showing that

> the defendant participated directly in the alleged constitutional violation;  (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to others' rights by failing to act on information indicating that constitutional acts were occurring.

Liner v. Goord, 582 F. Supp. 2d 431, 433 (W.D.N.Y. 2008) (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)); Hayut v. State Univ. of New York, 352 F.3d 733, 753 (2d Cir. 2003).

## C.   Excessive Force Claim against Murray and Thatcher

Foster argues that Defendants Murray and Thatcher used excessive force against him during the incident in the shower on December 30, 2010. Defendants argue that their

10

use of force was an appropriate means of restoring prison discipline, in the face of an attack by Foster.

### 1. Legal Standards

The Eighth Amendment "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." Wilson v. Seiter, 501 U.S. 294, 297, 11 S. Ct. 2321, 2323, 115 L. Ed. 2d 271 (1991); U.S. Const. amend. VIII. "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being." Helling v. McKinney, 509 U.S. 25, 32, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993) (quotation and citation omitted). Part of the state's duty is to protect inmates from punishments that are "totally without penological justification." See Williams v. Fitzpatrick, No. 03 CV 11, 2006 WL 1889964, at *2 (D. Vt. July 10, 2006) (quoting Rhodes v. Chapman, 452 U.S. 337, 346, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)).

To succeed on an Eighth Amendment excessive force claim, a plaintiff must establish (1) objectively, that the defendant's actions violated contemporary standards of decency, and (2) subjectively, that the defendant acted wantonly and in bad faith. See Flynn v. Ward, 9:15-CV-1028, 2016 WL 1357737, at *8 (N.D.N.Y. Apr. 5, 2016) (quoting Blyden v. Mancusi, 186 F.3d 252, 262-63 (2d Cir. 1999)).

### a. The Objective Requirement

To meet the objective requirement, the alleged violation must be sufficiently serious by objective standards, those being contemporary standards of decency. Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994); Blyden, 186 F.3d at 263. Although the "*de minimis* use of force will rarely suffice to state a

constitutional claim," <u>Romano v. Howarth</u>, 998 F.2d 101, 105 (2d Cir. 1993), "the malicious use of force to cause harm constitutes an Eighth Amendment violation per se because in such an instance 'contemporary standards of decency are always violated,'" <u>Flynn</u>, 2016 WL 1357737, at *8 (quoting <u>Blyden</u>, 186 F.3d at 263). Thus, *de minimis* use of force is excluded from constitutional recognition "provided that the use of force is not of a sort repugnant to the conscience of mankind." <u>Green v. Morse</u>, No. 00-CV-6533, 2005 WL 1490301, at *2 (W.D.N.Y. June 23, 2005) (quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 9-10, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)).

> The Second Circuit has explained an excessive force claim as follows:
>
> The malicious use of force to cause harm constitutes an Eighth Amendment violation per se whether or not significant injury is evident. This result follows because when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. Nevertheless, a *de minimis* use of force will rarely suffice to state a constitutional claim. Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.

<u>Griffin v. Crippen</u>, 193 F.3d 89, 91 (2d Cir. 1999) (citations and internal quotations omitted).

Thus, the objective prong may be satisfied without a showing of a serious or significant injury, as long as the amount of force used is not *de minimis*. <u>See</u> <u>United States v. Walsh</u>, 194 F.3d 37, 50 (2d Cir. 1999). At bottom, the key inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Hudson</u>, 503 U.S. at 7 (citation omitted); <u>see also</u> <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 37, 130 S. Ct. 1175, 175 L. Ed. 2d 995 (2010) (per curiam) (describing this inquiry as "the core judicial inquiry"). In other words, the key consideration is the nature of the force rather than the extent of the injury. <u>See</u> <u>Wilkins</u>, 559 U.S. at 34.

### b. The Subjective Requirement

To meet the subjective requirement, "the inmate must show that the prison officials involved 'had a wanton state of mind when they engaged in the misconduct.'" See Griffin, 193 F.3d at 91 (quoting Davidson v. Flynn, 32 F.3d 27, 30 (2d Cir. 1994)). In this context, the test for wantonness "is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003). Factors to be considered are "the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." Id. (citation omitted).

### 2. Foster's Excessive Force Claims

Foster claims that Murray and Thatcher used excessive force against him in violation of his Eight Amendment rights when Murray punched him, put him in a bear hug, and threw him to the ground, and when both Defendants kicked and beat him while he lay handcuffed on the floor. Defendants argue that any use of force was *de minimis* and that they were acting in good faith to restore discipline.

Having viewed the evidence and drawn all inferences in Foster's favor, this Court finds that no reasonable fact-finder viewing the admissible evidence could find that Murray and Thatcher violated Foster's right to be free from excessive force.

First, the evidence Foster has presented belies his account of the incident and the notion that he sustained a sufficiently serious use of force. The contemporaneous medical examination, records, and photographs reveal only a possible 3mm area of injury on his

13

clavicle. (Docket No. 42-1 at p. 142.) Nurse Walsh did not note swelling on his head or back. (Id.) Hours later, Nurse West noted a welt "approximately the size of a half dollar coin" on back left side of his head. (Id. at p. 143.) No nurse found bleeding, cuts, or bruising that would correspond with his being kicked by Murray and Thatcher. These injuries do not comport with Foster's allegations that Murray and Thatcher kicked and punched him while he was handcuffed on the floor. And Foster does not provide any evidence of Murray and Thatcher kicking and punching him, beyond his bare allegations.[3] This is not sufficient to defeat a motion for summary judgment. See Scotto v. Almenas, 143 F.3d 522, 525-26 (2d Cir. 1998) (conclusory allegations and unsubstantiated speculation cannot defeat summary judgment); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994) ("mere allegations or denials" not enough to defeat summary judgment); Adilovic v. Cty. of Westchester, No. 08-CV-10971, 2011 WL 2893101, at *7 (S.D.N.Y. July 14, 2011) (uncorroborated claims of a forceful beating alone cannot defeat summary judgment.)

Further, non-serious injuries of this type indicate a de minimis use of force. See Berkley v. Ware, No. 9:16-CV-1326, 2018 WL 373791, at *8 (N.D.N.Y. July 6, 2018) (swelling insufficiently serious); Gallagher v. Derkovicz, 13-CV-804 (LJV)(MJR), 2017 WL 1435710, at *1 (W.D.N.Y. Apr. 24, 2017) (temporary redness on the side of face and slight pain de minimis); Bermudez v. Waugh, No. 09:11-CV-947 (MAD/DEP), 2013 WL 654401, at *5 (N.D.N.Y. Feb. 21, 2013) (tackling of inmate that caused minor bruising was de minimis); James v. Phillips, No. 05 Civ. 1539 (PKC) (KNF), 2008 WL 1700125, at *4

---

[3] Although three inmates testified at Foster's Tier III hearing, he has not submitted affidavits or other admissible evidence from any witnesses to the event, for the purpose of opposing Defendants' motion for summary judgment.

(S.D.N.Y. Apr. 9, 2008) (swelling of chin insufficiently serious). Given the absence of evidence corroborating Foster's allegations, or showing anything beyond *de minimis* injuries, Foster has not met the objective requirement of a sufficiently serious injury.

Even assuming that his injuries were more than *de minimis*, there is insufficient evidence from which a reasonable fact-finder could conclude that Murray or Thatcher acted with wantonness or maliciousness. Foster asserts that a video of the showers shows that Defendants "huddled" before moving toward shower 1. (Docket No. 43, ¶¶ 12-15.) But the mere fact of "huddling," without more, does not establish malicious intent.[4] Both Murray and Thatcher state that Foster moved to attack Murray and that they used force to bring him to the ground and restrain him as he continued to resist. The injuries Foster sustained—including the welt noted by Nurse West—match this description of events. They do not suggest malice, but rather a *de minimis* use of force to restore order.

Considering the record as a whole, there is simply no evidence from which a reasonable fact-finder could conclude that Murray and Thatcher applied force maliciously and sadistically to cause Foster harm, rather than in a good-faith effort to maintain order. See Scott, 344 F.3d at 291. A reasonable fact-finder therefore could not find in Foster's favor on the subjective prong of the analysis. Cf. Griffin, 193 F.3d at 91 (malicious use of force to cause harm constitutes an Eighth Amendment violation per se whether or not significant injury is evident).

For all of these reasons, Defendants are entitled to summary judgment on Foster's Eighth Amendment excessive force claim. And because Foster's failure-to-protect claim

---

[4] Defendants assert that this videotape is not in the evidence submitted by Foster, and they have not had a chance to review it. This Court does not find it among the evidence Foster has submitted, and therefore has not considered it.

against Cleveland is premised on his excessive force claim, Defendants are entitled to summary judgment on the claim against Cleveland as well.  See Jacobs v. Bayha, 616 Fed. Appx. 507, 515 n.13 (3d Cir. July 14, 2015) ("in the absence of excessive force, there was no failure to protect"); Alexander v. Nolan, 6:17-CV-725 (GTS/ATB), 2018 WL 6621400, at *8 (N.D.N.Y. Dec. 18, 2018) (finding that failure-to-intervene claim requires underlying constitutional violation) (collecting cases); Walker v. City of New York, 11-CV-314 (CBA)(JMA), 2014 WL 12652345, at *12 (E.D.N.Y. Sept. 3, 2014) ("To prevail on a failure to intervene claim a plaintiff must demonstrate the existence of an underlying constitutional violation in which the defendant officer failed to intervene.") (collecting cases); Jenkins v. Caplan, No. C 02-5603 RMW (PR), 2012 WL 12904629, at *15 (N.D.Ca. Mar. 30, 2012) ("Because the court finds that Thompson did not use excessive force, plaintiff's "failure to protect" claim against Padilla necessarily fails."); Lopez v. City of New York, No. 05 Civ. 10321 (NRB), 2009 WL 229956, at *6 (S.D.N.Y. Jan. 30, 1999) (finding that absence of excessive force precludes a finding of failing to intervene).

**D.    Failure-to-Protect Claim against Cleveland**

As discussed above, this Court finds that Foster's failure-to-protect claim fails on the same basis as his excessive force claims against Murray and Thatcher. But his failure-to-protect claim also fails because Foster did not exhaust his claims administratively against Cleveland.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104–134, 110 Stat. 1321 (1996) expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are

available are exhausted."  42 U.S.C. § 1997e(a); <u>see also</u> <u>Woodford v. Ngo</u>, 548 U.S. 81, 85, 126 S. Ct. 2378, 165 L. Ed. 2d (2006) ("Exhaustion is . . . mandatory. Prisoners must now exhaust all 'available' remedies[.]"); <u>Hargrove v. Riley</u>, No. 04–CV–4587, 2007 WL 389003, at *5-*6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983.").  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  <u>Porter v. Nussle</u>, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002).

In the event the defendant establishes that the inmate plaintiff failed to fully complete the administrative review process before commencing the action, the plaintiff's complaint is subject to dismissal.  <u>See</u> <u>Pettus v. McCoy</u>, No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006); <u>see also</u> <u>Woodford</u>, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." <u>Woodford</u>, 548 U.S. at 95; <u>accord</u> <u>Macias v. Zenk</u>, 495 F.3d 37, 43 (2d Cir. 2007).

In New York, formal exhaustion of administrative remedies for prison inmates requires compliance with a detailed three-step grievance and appeal procedure.  <u>See</u> <u>Morrison v. Parmele</u>, 892 F. Supp. 2d 485, 487 (W.D.N.Y. 2012) (citing 7 N.Y.C.R.R. § 701.5)). The grievance process outlined at § 701.5 provides that: (1) the inmate must submit a written complaint to the Grievance Clerk within 21 calendar days of the alleged occurrence; the Grievance Clerk then submits the complaint to the Inmate Grievance

Resolution Committee ("IGRC") for investigation and review; (2) if the IGRC denies the grievance, the inmate may appeal to the superintendent of the facility by filing an appeal with the IGP clerk; (3) after the superintendent issues a decision, the inmate may appeal to the Central Office Review Committee ("CORC"), which makes the final administrative determination. See Thousand v. Corrigan, 9:15-CV-01025 (MAD/ATB), 2017 WL 1093275, at *3 (N.D.N.Y. Mar. 23, 2017); Turner v. Goord, 376 F. Supp. 2d 321, 323 (W.D.N.Y. 2005). "A prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure." Hairston v. LaMarche, Case No.05 Civ. 6642, 2006 WL 2309592, at *7 (S.D.N.Y. Aug.10, 2006) (citing cases). If all three levels of review are exhausted, the prisoner may seek relief in federal court under § 1983. See Thousand, 2017 WL 1093275, at *3; Bridgeforth v. DSP Bartlett, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010).

While the Supreme Court has deemed the exhaustion of administrative remedies generally mandatory, it has held that a prisoner's duty to exhaust is limited to "available" administrative remedies.[5] Ross v. Blake, __ U.S. __, 136 S. Ct. 1850, 1855, 195 L. Ed. 2d 117 (2016) ("A prisoner need not exhaust remedies if they are not 'available.'"). "An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." Id. at 1858. To be "available," administrative remedies (e.g., grievance procedures) must be "capable of use to obtain some relief for the action complained of." Id. at 1859 (quoting Booth v. Churner, 532 U.S. 731, 738, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001)).

---

[5] With this holding, the Court in Ross rejected the Second Circuit's "extra-textual" exception to the exhaustion requirement, which allowed courts to consider whether "special circumstances" justified a prisoner's failure to exhaust administrative remedies. See Williams, 829 F.3d 118, 123 (2d Cir. 2016) (recognizing that Ross largely abrogates the framework set forth in Giano v. Goord, 380 F.3d 670, 675-76 (2d Cir. 2004) and Hemphill v. New York, 380 F.3d 680 (2d Cir. 2004), which set forth a "special circumstances" exception to the PLRA's exhaustion requirement).

The Court in Ross identified three circumstances in which an administrative remedy may be unavailable:

> First, an administrative remedy may be unavailable when it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. Second, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In other words, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it. Third, an administrative remedy may be unavailable when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.

Williams v. Correction Officer Priatno, 829 F.3d 118, 123-24 (2d Cir. 2016) (citing Ross, 136 S. Ct. at 1859-60) (quotation marks and citations omitted).

Here, it is undisputed that Foster failed to file an Inmate Grievance in relation to Cleveland's alleged failure to protect him during the use of force by Murray and Thatcher. (Docket No. 36-2, ¶ 36.) Foster did not mention Cleveland in his grievance against Murray and Thatcher. (See Docket No. 20 at pp. 116-118.) In fact, Foster wrote a letter specifically exonerating Cleveland for any use of force. (Docket No. 30-3 at p. 1.) Nowhere does Foster contend that he followed the available grievance procedures regarding Cleveland's alleged failure to protect him. He therefore failed to exhaust, or even pursue, all administrative remedies that were available to him. This Court will therefore dismiss Foster's failure-to-protect claims against Cleveland on this basis as well. See Guarneri v. West, 782 F. Supp. 2d 51, 59 (W.D.N.Y. 2011) ("Each level of the grievance procedure must be exhausted before an inmate may commence litigation in federal court.").

**E. Procedural Due Process Claims against Donahue and Venetozzi**

Foster argues that Donahue violated his Fourteenth Amendment Due Process rights by not allowing him to call the witnesses he requested at his Tier III hearing. Foster

also argues that Venetozzi violated his Fourteenth Amendment rights by affirming Donahue's Tier III decision. Defendants argue that the 96 days Foster spent in the SHU do not suffice for a constitutional violation, that Donahue permissibly denied testimony of witnesses who were not present at the use of force, and that Venetozzi is not liable merely for affirming Donahue's decision.

### 1. Legal Standards

Plaintiff alleges that the Tier III hearing on his Misbehavior Report was constitutionally infirm.  He thus asserts a procedural due process claim.  To prevail on this claim, he must establish (1) that he possessed a protected liberty or property interest and (2) that Defendants deprived him of that interest through constitutionally insufficient procedures.  See Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001) (citing Bedoya v. Coughlin, 91 F.3d 349, 351-52 (2d Cir. 1996)); Durran v. Selsky, 251 F. Supp. 2d 1208, 1214 (W.D.N.Y. 2003).

### a. Liberty Interest

"A liberty interest may arise from either of two sources – the Due Process Clause itself [or] the laws of the States." Rodriguez v. McLoughlin, 214 F.3d 328, 337 (2d Cir. 2000) (quoting Kentucky Dep't of Corrs. v. Thompson, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (internal quotation omitted)).  A prisoner must identify a viable liberty interest before he can demonstrate that such an interest was infringed.  Palmer v. Richards, 364 F.3d 60, 64 n. 2 (2d Cir. 2004); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir. 1996) (per curiam).

"A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the

inmate in relation to the ordinary incidents of prison life.'" <u>Palmer</u>, 364 F.3d at 64 (quoting <u>Sandin v. Connor</u>, 515 U.S. 472, 484, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995)). The prisoner's actual punishment must be examined in making this determination.  <u>See</u> <u>Scott v. Albury</u>, 156 F.3d 283, 287 (2d Cir. 1998) (per curiam).  In this regard, the Second Circuit has consistently held that both the duration and conditions of confinement must be considered.  <u>See</u> <u>Palmer</u>, 364 F.3d at 64; <u>Ortiz v. McBride</u>, 323 F.3d 191, 195 (2d Cir. 2003) (per curiam); <u>Sealey v. Giltner</u>, 197 F.3d 578, 586 (2d Cir. 1999) ("Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical.").

While there is no bright-line rule regarding the length or type of sanction that constitutes an atypical and significant hardship under <u>Sandin</u>, the Second Circuit has provided guidance on the type of treatment that implicates a prisoner's liberty interest. <u>See</u> <u>Jenkins v. Haubert</u>, 179 F.3d 19, 28 (2d Cir. 1999) (no bright-line rule).  For example, SHU confinement of less than 101 days does not implicate a prisoner's liberty interest unless it is demonstrated that the conditions were more severe or extreme than normal SHU conditions. <u>See</u> <u>Palmer</u>, 364 F.3d at 65. SHU confinement of an intermediate duration – between 101 and 304 days – requires the district court to develop a detailed record of the conditions of confinement relative to ordinary prison conditions.  <u>See</u> <u>Colon v. Howard</u>, 215 F.3d 227, 232 (2d Cir. 2000). SHU confinement of more than an intermediate duration (305 days or more) under normal conditions is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under <u>Sandin</u>." <u>Id.</u> at 231 (finding that a prisoner's liberty interest was

infringed by 305-day SHU confinement).

A court can consider a term of SHU confinement that precedes a hearing where a due process violation is alleged, for purposes of establishing the liberty interest at stake. Sealey, 197 F.3d at 587–88 ("Although the confinement for these 18 days alone is not alleged to have implicated a liberty interest and although Giltner had no responsibility for determining the procedures (or their lack) with respect to such confinement, he nonetheless bears responsibility for the 101–day aggregate of the 83 days of confinement after his hearing and the 18 days that preceded it. Wherever the point is beyond which confinement in harsh conditions constitutes atypicality, a prison official must not be permitted to extend such confinement beyond that point without according procedural due process.")

The Second Circuit has suggested that "separate SHU sentences should be aggregated for purposes of the Sandin inquiry when they constitute a sustained period of confinement." Giano, 238 F.3d at 226. Separate SHU sentences constitute a "sustained" period of confinement when they are contiguous and either were imposed by the same disciplinary hearing officer or were based on the same administrative rationale and are executed under the same conditions. Bernier v Sweet, No. 15-CV-209 (RJA)(HBS), 2018 WL 1047102, at *4 (W.D.N.Y. Feb. 26, 2018), report and recommendation adopted, No. 15-CV-209A, 2018 WL 1827660 (W.D.N.Y. Apr. 17, 2018) (citing Taylor v. Artus, No. 05-CV-0271, 2007 WL 4555932, at *8 (N.D.N.Y. Dec. 19, 2007)).

### b.    Process Due

After determining whether a liberty interest is implicated, a court must determine whether the inmate received the process he or she was due. Wolff v. McDonnell, 418

U.S. 539, 563-66, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974). Due process rights provide for the following procedural safeguards: "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." Smith v. Fischer, 803 F.3d 124, 127 (2d Cir. 2015) (per curiam) (quoting Luna v. Pico, 356 F.3d 481, 487 (2d Cir. 2004)); see also Wolff, 418 U.S. at 563-71.

"[T]he inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." Wolff, 418 U.S. at 566. An official may refuse to call witnesses as long as the refusal is justifiable, because "[p]rison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority." Id. at 566-67. Both the Supreme Court and the Second Circuit agree that "a prisoner's request for a witness can be denied on the basis of irrelevance or lack of necessity." Kingsley v. Bureau of Prisons, 937 F.2d 26, 30 (2d Cir. 1991). However, the burden is not upon the inmate to prove the official's conduct was arbitrary and capricious, but upon the official to prove the rationality of the position. Id. at 30-31 (citing Ponte v. Real, 471 U.S. 491, 495, 105 S. Ct. 2192, 2195, 85 L. Ed. 2d 553 (1985)).

Ultimately, due process requires only that there be some evidence to support the findings made in the disciplinary hearing. Superintendant v. Hill, 472 U.S. 445, 457, 105 S. Ct. 2768, 86 L. Ed. 2d 356 (1985).

### 2. Foster's Due Process Claim against Donahue

Defendants first argue that Foster has not stated a constitutional violation because he did not suffer an "atypical and significant hardship." Foster argues that his 96 days in SHU, in conjunction with the deprivation orders he experienced, constitute such a hardship.

As noted above, the Second Circuit has held that SHU confinement for 101 days under normal conditions does not amount to an "atypical and significant hardship" under Sandin. Sealey, 197 F.3d at 589. Under unusual SHU conditions, periods of less than 101 days can implicate a liberty interest. Ortiz v. McBride, 380 F.3d 649, 654-55 (2d Cir. 2004) (citing Palmer v. Richards, 364 F.3d 60, 65 (2d Cir. 2004)). And, under certain conditions, courts can aggregate penalties for the purpose of the Sandin analysis. Sealey, 197 F.3d at 587.

Foster spent 96 days in SHU under normal conditions as a result of the guilty determination by Donahue. Without more, this does not amount to an atypical hardship. Foster argues that this Court should consider the deprivation orders he experienced in conjunction with his SHU term. As an initial matter, there is no evidence that Foster ever grieved these orders. Additionally, the deprivation orders lasted from December 30, 2010, through January 21, 2011, and Foster's SHU term did not begin until October 16, 2011; the two penalties are clearly not contiguous. And Donahue did not sign the deprivation orders. This Court therefore declines to aggregate the two penalties.

This Court finds that Foster's 96-day SHU sentence does not implicate a liberty interest. Ortiz, 380 F.3d at 654 ("[p]rison discipline implicates a liberty interest [only] when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'") (quoting Sandin, 515 U.S. at 484); see also Sealey, 197 F.3d at

589 (101 day confinement in SHU, with no additional allegations of conditions harsher than usual SHU conditions, did not implicate a liberty interest); <u>Brown v. Venetozzi</u>, 2019 WL 4194432, at *5 (allegations of 210 days in SHU confinement, a dingy cell, one hour of exercise per day, two showers per week, and no access to prison activities did not sufficiently allege "atypical" conditions of confinement).

Because Foster was not deprived of a liberty interest by being sentenced to 96 days in SHU under ordinary conditions, this Court finds that his due process claim against Donahue must fail, and will not proceed to the second part of the due process inquiry.

### 3. Foster's Due Process Claim against Venetozzi

Because this Court does not find a due process violation in Foster's Tier III hearing, it cannot find a due process violation in Venetozzi's affirmance of that decision. Additionally, even if Foster were able to show a denial of due process rights at the Tier III hearing, Venetozzi could be held liable only if he was personally involved in the violation.

Courts in the Second Circuit are split on whether simply affirming a decision can establish liability. Some courts find liability merely in affirming a decision. <u>See, e.g.</u>, <u>Tolliver v. Lilley</u>, No. 12–CV–971, 2014 WL 10447163, at *12 (S.D.N.Y. Oct. 24, 2014) ("Prack received [the plaintiff's] grievance, reviewed it and acted on it, personally. Accordingly, the allegations against Prack are sufficient to state personal involvement and dismissing the claims against him based on this ground is not warranted ...."), <u>adopted sub nom.</u> <u>Tolliver v. Skinner</u>, No. 12–CV–971, 2015 WL 5660440 (S.D.N.Y. Sept. 25, 2015); <u>Murray v. Arquitt</u>, No. 10–CV–1440, 2014 WL 4676569, at *12 (N.D.N.Y. Sept. 18, 2014) ("The affirmation of an allegedly unconstitutional disciplinary hearing appears to establish personal involvement."); <u>Delgado v. Bezio</u>, No. 09–CV–6899, 2011 WL

1842294, at *9 (S.D.N.Y. May 9, 2011) ("[I]t cannot be said that the Iqbal holding precludes liability where, as is alleged here, supervisory personnel affirmed a decision that they knew to have been imposed in violation of Plaintiff[']s due process rights, thus continuing a deprivation of liberty without due process of law").

Other courts, however, have found that merely affirming a hearing determination is not a sufficient basis to impose liability. Woodward v. Mullah, No. 08-CV-463A, 2009 WL 4730309, at *3 (W.D.N.Y. Dec. 7, 2009) (citing Abdur–Raheem v. Selsky, 598 F. Supp. 2d 367, 370 (W.D.N.Y.2009) (Larimer, J.) ("The only allegation concerning Selsky in the case at bar is that he affirmed the disposition of plaintiff's administrative segregation hearing, pursuant to which plaintiff was confined to SHU.... That is not enough to establish Selsky's personal involvement."); Ramsey v. Goord, 2005 WL 2000144, *6 (W.D.N.Y.2005) (Skretny, J.) ("the fact that Commissioner Goord and SHU Director Selsky, as officials in the DOCS 'chain of command,' affirmed defendant Ryerson's determination on appeal is not enough to establish personal involvement of their part").

The distinction between these cases appears to be that "while personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results." Hamilton v. Smith, No. 06-CV-805 (GTS/DRH), 2009 WL 3199531, at *22 (N.D.N.Y. Jan. 13, 2009), report and recommendation adopted as modified, No. 9:06-CV-0805(GTSDRH), 2009 WL 3199520 (N.D.N.Y. Sept. 30, 2009).

Still other courts find that a violation must be ongoing for a supervisor to be held liable for knowing of it and failing to correct it. Jamison v. Fischer, No. 11 CIV. 4697 RJS, 2012 WL 4767173, at *4 (S.D.N.Y. Sept. 27, 2012) ("Bezio was not present at the hearing

when this violation allegedly occurred, and the violation, if any, was isolated to the hearing itself. … Put simply, Bezio could not have corrected the alleged denial of Plaintiff's ability to call witnesses at the hearing because—by definition—the hearing ended before Bezio became involved through Plaintiff's appeal. … Therefore, Bezio was not personally involved because the alleged constitutional violation was not ongoing at the time of Plaintiff's administrative appeal.")

Here, there is no evidence that Venetozzi did anything more than rubber-stamp Donahue's decision. Venetozzi asserts that he never met Foster, and that he never received any letters from Foster. (Venetozzi Declaration, Docket No. 36-10, ¶¶ 3-6.) Defendants have submitted Venetozzi's one-sentence decision affirming Donahue's decision. (Docket No. 20-1 at p. 78.) Foster does not bring forth any evidence suggesting that Venetozzi played a more active role in affirming Donahue's decision, or that Donahue's alleged violation was more than a one-time occurrence, let alone an ongoing constitutional violation. There is no question of fact regarding Venetozzi's personal involvement in any constitutional violation that may have occurred, and he is therefore entitled to summary judgment on Foster's claim against him.

## IV. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is granted. This Court finds that Foster has not raised a question of fact regarding Murray's and Thatcher's use of force, has failed to exhaust his administrative remedies against Cleveland, has not pointed to a liberty interest at stake in the Tier III hearing held by Donahue, and has raised no question of fact regarding Venetozzi's personal involvement in Donahue's alleged due-process violation.

## V.  ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 36) is GRANTED.

FURTHER, that the Clerk of Court is directed to CLOSE this case.

SO ORDERED.

Dated:        April 13, 2020
              Buffalo, New York

s/William M. Skretny
WILLIAM M. SKRETNY
United States District Judge
